# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

Patrick Barron,

        Plaintiff,

Civ. No. 12-699 (RHK/SER)
**MEMORANDUM OPINION AND ORDER**

v.

DeCare Dental, LLC, and The
WellPoint Companies, Inc.,

        Defendants.

Stephen C. Fiebiger, Stephen C. Fiebiger Law Office, Chartered, Burnsville, Minnesota, for Plaintiff.

Jaime N. Cole, Ogletree, Deakins, Nash, Smoak & Stewart, P.C., Minneapolis, Minnesota, for Defendants.

## INTRODUCTION

Plaintiff Patrick Barron is a recovering alcoholic. He worked for Defendants DeCare Dental, LLC and The WellPoint Companies, Inc.[1] in the mailroom from 2004 to 2011. After Defendants terminated his employment, he commenced this action alleging they had discriminated and retaliated against him on account of his alcoholism, in violation of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12201 *et seq.*, and the Minnesota Human Rights Act ("MHRA"), Minn. Stat. § 363A.01 *et seq.* He also alleges that Defendants paid him less than similarly situated females, in violation of the

---

[1] DeCare Dental, a dental-benefit management company, was acquired by The WellPoint Companies, a large health-benefit provider, in 2009.

Equal Pay Act ("EPA"), 29 U.S.C. § 206(d). Finally, he alleges that Defendants retaliated against him after he complained about the foregoing, in violation of the Minnesota Whistleblower Act, Minn. Stat. § 181.932. Presently before the Court is Defendants' Motion for Summary Judgment. For the reasons that follow, the Motion will be granted in part and denied in part.

## BACKGROUND

Viewed in the light most favorable to Barron, the record reveals the following facts. Barron began working for Defendants as a temporary employee in late 2004. He operated one of two high-speed mailing machines in the "kernroom," the back portion of the mailroom; the other machine was operated by Sandee Babcock. The machines filled and sorted thousands of envelopes containing checks, explanation-of-benefit forms, ID cards, and similar items. The kernroom's day-to-day operations were supervised by team leader Scott Regan, and the mailroom's overall functions were supervised by Regan's boss, Debra Baron Dekock. While a temporary employee, Barron informed Regan, Dekock, and others that he was a recovering alcoholic.

Barron alleges that because of his prior alcohol use, he is "sensitive" to the odor of alcohol. He further alleges that Regan smelled of alcohol "all the time," but he did not complain while a temporary employee so as not to "rock the boat." Despite the odor, he performed well in his temporary role, and in January 2005 Dekock hired him to work in the kernroom full-time. According to Barron, however, shortly after commencing full-time employment, Dekock confronted him, stuck her finger in his face and told him, "I was married to a drunk, so don't try and pull your shit here." And he contends that

Dekock proceeded to treat him poorly for the remainder of his employment. For example, he claims that she often asked if he had been late to work, although he acknowledges she never disciplined him for tardiness. She would also ignore him at times or tell him to "grab a broom" if she saw him standing around, but he admits she did the same to other employees. More importantly, Barron and Babcock testified in their depositions that Dekock had "favorites" that did not include them, but that *did* include mailroom employees Deb White, another recovering alcoholic, and Regan, whom they labeled an alcoholic.

Notwithstanding his alleged mistreatment by Dekock, Barron performed well as a machine operator; his interactions with others, however, were below par. While he consistently processed more mail than Babcock and received positive feedback for his machine operator work, his annual reviews were littered with comments indicating that he did not take direction well from supervisors, failed to communicate effectively with coworkers, and needed to find ways to act respectfully toward others. The review forms included space for employee comments, but Barron did not dispute these criticisms. He also acknowledges being verbally reprimanded by Dekock several times, and on at least two occasions he received written warnings stemming from his interactions with others.

In 2006, Barron began complaining to his superiors and Defendants' human resources (HR) department about the smell of alcohol on Regan.[2] He claims HR did nothing about these complaints and often trivialized them. For example, when he told Keri Eccles, an HR employee, that he wanted to transfer to another department to get

[2] Barron testified that he complained to HR five to ten times over the course of his employment.

away from Regan, she told him to "go apply across the street."[3]  He also complained to Eccles's boss, Elizabeth Peifer, but she did not speak to Regan about the complaints or attempt to verify them with anyone in the mailroom.  Barron also asserts that he complained to Dekock about the smell on Regan, and she responded, "How dare you go to HR after we gave you a job."  She also denied smelling alcohol on Regan, to which Barron told her, "You're a liar."  Although Barron asserts that the smell emanating from Regan was strong enough to make him feel sick, there is no evidence in the record that it affected his ability to operate the mailing machine – indeed, his reviews consistently noted his quality performance.  Nevertheless, he eventually began skipping work on Mondays and Fridays, the days on which Barron asserts that Regan smelled the worst, to avoid the odor.

On February 18, 2011, Barron asked Peifer to transfer him to another department, due to the smell from Regan and his treatment by Dekock, whom he felt was creating a hostile work environment.  Peifer responded that she could not do anything about the smell after the fact, and she told Barron to report it the next time he noticed it.  He responded that Peifer should "stop down [at the mailroom] any day of the week," but she took no further action.  There is also no indication she took any action regarding the complaints about Dekock.

That same day, Barron also had a meeting with Dekock and Peifer to complain about his pay.  He had discovered from Babcock that she was being paid significantly

---

[3] Eccles acknowledged this statement in her deposition but explained that Barron was on "corrective action" at the time due to one of his written warnings, and he was therefore ineligible to apply for an internal transfer.

more[4] despite having the same job and Barron outproducing her. Peifer undertook a review of Barron's pay and discovered that it was below the "Market Reference Point," Defendants' assessment of the value of the job in the marketplace. Nevertheless, she learned that Barron had received a raise every year he had been employed by Defendants, including at least once while he was on corrective action. Peifer also spoke with Dekock and noted that Babcock had higher annual review scores than Barron and had worked for Defendants for nine years longer. Ultimately, she concluded that Barron was fairly compensated when all of these factors were taken into consideration.

On April 7, 2011, Barron met with Dekock and Peifer to discuss Peifer's conclusions regarding his pay. Peifer explained that pay was determined based on overall experience, tenure in the particular job, performance, behavior, and several other factors. When Barron responded by mentioning Dekock's "hostility" toward him and Regan's alcohol smell, Peifer ended the meeting.

Barron was unsatisfied. He returned to Peifer's office later that day; he claims the ensuing discussion was brief and remained professional. Peifer paints a very different picture of the encounter. She testified in her deposition that Barron "marched" into HR, cornered her, glared, pointed his finger in her face, spoke in a loud and accusatory tone, and brought his face within inches of hers. She was very uncomfortable and unsure if Barron was going to strike her. Although he made no verbal threats, she perceived his tone, the closeness of his approach, and his mannerisms as threatening. Eccles witnessed the encounter and described Barron as "extremely loud, abrasive, and right in [Peifer's]

---

[4] At the time, Barron was paid $13.70 per hour and Babcock was paid $16.98 per hour.

face, . . . looking agitated, pointing his finger, and . . . hollering." She called it a "scary conversation" and, after Barron had "stormed off," she checked with Peifer to make sure she was alright. Notably, Barron admitted in his deposition that he was "angry" and "pissed off" when he went to HR, and he did not deny that he was talking loudly (which he attributed to earplugs he wore while working in the mailroom).

Barron called Peifer the following day and left her a voicemail message about the pay issue. Peifer "lost it." She became concerned for her safety and worried that Barron would "come after her." She reported the April 7 incident to her supervisor, Kelley McCready, Defendants' HR Director, when he traveled to Minnesota on April 15, 2011.[5] McCready spoke with Eccles, who confirmed Peifer's description of events; he also spoke with Dekock about the situation and Barron's prior employment issues. He did not interview Barron, and he left it up to Dekock to decide what to do about the situation. Dekock felt that Barron had engaged in a long pattern of unacceptable conduct, including belligerence toward his coworkers, that he was unlikely to change, and that the confrontation with Peifer had been a significant escalation. Accordingly, on April 20, 2011, she decided to terminate his employment. The following day, however, she met with Barron to get his side of the story. He claimed he could not recall the encounter and denied that he would have acted in a hostile manner toward Peifer. Dekock was unswayed. Later that day, Barron was summoned to a meeting at which Dekock, Regan, and Eccles were present. Upon hearing that he was being discharged, Barron stated, "See ya in court," walked out of the room, gathered his belongings, and left the building.

---

[5] McCready worked in Defendants' Denver office.

Barron later filed a charge of discrimination with the EEOC, alleging that he had been discriminated and retaliated against on account of his alcoholism. The EEOC dismissed the charge on December 30, 2011, and issued a right-to-sue letter. This action followed. The parties have undertaken significant discovery, and with that discovery complete, Defendants now move for summary judgment. The Motion has been fully briefed, the Court heard oral argument on July 15, 2013, and the Motion is ripe for disposition.

## STANDARD OF REVIEW

Summary judgment is proper if, drawing all reasonable inferences in favor of the nonmoving party, there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); Ricci v. DeStefano, 557 U.S. 557, 586 (2009). The moving party bears the burden of showing that the material facts in the case are undisputed. Torgerson v. City of Rochester, 643 F.3d 1031, 1042 (8th Cir. 2011) (*en banc*);[6] Whisenhunt v. Sw. Bell Tel., 573 F.3d 565, 568 (8th Cir. 2009). The Court must view the evidence, and the inferences that may be reasonably drawn from it, in the light most favorable to the nonmoving party. Beard v. Banks, 548 U.S. 521, 529-30 (2006); Weitz Co., LLC v. Lloyd's of London, 574 F.3d 885, 892 (8th Cir. 2009). The nonmoving party may not rest on mere allegations or denials, but must show through the presentation of admissible evidence that specific facts exist creating a

---

[6] Several Eighth Circuit cases cited herein have a "red flag" on Westlaw as a result of Torgerson, which abrogated a litany of decisions suggesting summary judgment should be sparingly granted in discrimination cases. Because these cases are cited for different legal principles that remain good law, the Court has not indicated such abrogation.

genuine issue of material fact for trial.  Fed. R. Civ. P. 56(c)(1)(A); Wood v. SatCom Mktg., LLC, 705 F.3d 823, 828 (8th Cir. 2013).

## ANALYSIS[7]

### I.    The disability claims

Barron first alleges that Defendants engaged in disability discrimination and retaliation in violation of the ADA (Count I) and the MHRA (Count II).  Specifically, he alleges that Defendants (1) unlawfully terminated his employment, (2) subjected him to a hostile work environment, and (3) failed to reasonably accommodate his disability, and then retaliated against him due to his complaints of mistreatment.  Each of these claims falters for the reasons below.

### A.    Discrimination

The ADA prohibits discrimination against qualified individuals on the basis of disability.  42 U.S.C. § 12112(a).[8]  In the absence of direct evidence of discrimination,

---

[7] At oral argument, Defendants suggested that the burden of proof on Barron's claims had been significantly increased by the Supreme Court's decision in University of Texas Southwestern Medical Center v. Nassar, __ U.S. __, 133 S. Ct. 2517 (2013), which was decided three days before Defendants submitted their Reply brief.  Because the parties had not previously addressed this issue, the Court allowed them to submit supplemental letter briefs.  (See Doc. Nos. 54, 56.) Having considered those submissions, the Court does not believe Nassar changed the legal landscape in any meaningful way here.  Nearly all of Barron's claims fail even under the "lesser" standards articulated pre-Nassar, as discussed below, and the Court does not believe that Nassar, which was a Title VII retaliation case, alters the analysis on the lone claim that survives (unequal pay under the Equal Pay Act).

[8] "In general, the ADA and the MHRA are . . . construed the same."  Loye v. Cnty. of Dakota, 625 F.3d 494, 496 n.2 (8th Cir. 2010).  As was the case in Loye, Barron's "brief asserts . . . that [the MHRA] imposes more stringent requirements than the ADA, but [he] make[s] no separate MHRA argument."  Id. (internal quotation marks deleted).  Accordingly, the Court will analyze his ADA and MHRA claims together.  See id.; see also Kirkeberg v. Canadian Pac. Ry., 619 F.3d 898, 907 (8th Cir. 2010) (noting that the Minnesota Supreme Court has held the MHRA

which Barron has not alleged, an ADA discrimination claim is evaluated under the familiar McDonnell Douglas burden-shifting framework. E.g., Knutson v. Schwan's Home Serv., Inc., 711 F.3d 911, 913 (8th Cir. 2013); Brown v. City of Jacksonville, 711 F.3d 883, 888-89 (8th Cir. 2013). Barron must first establish a *prima facie* case of discrimination, which (in accordance with recent amendments to the ADA[9]) requires him to proffer sufficient evidence to show (1) he "is a 'qualified individual' under the ADA," (2) he "suffered 'discriminat[ion]' as the term is defined by the ADA," and (3) "the 'discriminat[ion]' was 'bas[ed]' on 'disability' as defined by the ADA." Brown, 711 F.3d at 888 (quoting 42 U.S.C. § 12112(a)). If he can do so, the burden shifts to Defendants to proffer a legitimate, non-discriminatory reason for their conduct, after which Barron must proffer sufficient evidence to show that Defendants' reason "is a pretext." St. Martin v. City of St. Paul, 680 F.3d 1027, 1033 (8th Cir. 2012).

The parties dispute whether Barron has established a *prima facie* case of discrimination based on the termination of his employment. (See Def. Mem. at 20-25; Mem. in Opp'n at 31-37.) But the Court need not resolve that dispute, because Defendants have proffered a legitimate, non-discriminatory reason for his termination: the April 7 encounter with Peifer. Hence, the Court will assume he has established a *prima facie* case and proceed directly to whether the proffered reason was a pretext for discrimination. See, e.g., Gibson v. Am. Greetings Corp., 670 F.3d 844, 854 (8th Cir.

---

imposes less onerous requirements than the ADA but has "offered little elaboration on the difference").

[9] The ADA was amended effective January 1, 2009, by the ADA Amendments Act of 2008 (known by the unfortunate acronym "ADAAA"). Pub. L. No. 110-325, 122 Stat. 3553 (2008).

2012); <u>Anderson v. Durham D & M, L.L.C.</u>, 606 F.3d 513, 521 (8th Cir. 2010).[10]  In the

Court's view, the record does not create a genuine issue on that question.

Barron points to a bevy of items in an attempt to demonstrate pretext, but the

Court finds most either unsupported, overstated, taken out of context, or insufficiently

probative.  For example, he contends that Defendants "fabricated a terminable

encounter," namely, the April 7 incident.  (Mem. in Opp'n at 41.)  While a plaintiff may

create a genuine issue on pretext by "showing the [defendant's] proffered explanation has

'no basis in fact,'" <u>Anderson</u>, 606 F.3d at 521 (citation omitted), Barron does not deny

the April 7 encounter took place; does not deny that he raised his voice at Peifer; and

does not deny that he was "angry" and "pissed off" when he approached her.  Nor does

he dispute that acting in a hostile manner toward a co-worker would be a sufficient basis

for termination.[11]  Hence, it is difficult to understand precisely what Defendants

supposedly "fabricated."  Simply put, "the ADA does not insulate emotional or violent

outbursts," <u>Hamilton v. Sw. Bell Tel. Co.</u>, 136 F.3d 1047, 1052 (5th Cir. 1998), and is not

---

[10] Despite this assumption, one element of the *prima facie* case – that Barron suffers from a disability – is not free from doubt.  Although the ADAAA "broadened the definition of what constitutes a disability," <u>Nyrop v. Indep. Sch. Dist. No. 11</u>, 616 F.3d 728, 734 n.4 (8th Cir. 2010), courts have repeatedly recognized that alcoholism is not a disability under the ADA *per se*.  <u>See, e.g.</u>, <u>Wallin v. Minn. Dep't of Corr.</u>, 153 F.3d 681, 686 n.4 (8th Cir. 1998) (citing <u>Burch v. Coca-Cola Co.</u>, 119 F.3d 305, 316 (5th Cir. 1997)); <u>Bailey v. Ga.-Pac. Corp.</u>, 306 F.3d 1162, 1167-68 (1st Cir. 2002); <u>Reg'l Econ. Cmty. Action Program, Inc. v. City of Middletown</u>, 294 F.3d 35, 47 (2d Cir. 2002); <u>Oxford House, Inc. v. City of Baton Rouge</u>, Civ. A. No. 11-391, 2013 WL 1154291, at *3 (M.D. La. Mar. 19, 2013).

[11] Barron claims that White once threatened to hit another mailroom employee but was not terminated.  He points to no evidence in the record, however, that the "threatened" employee complained about the incident or that it was otherwise reported.

"a license for insubordination at the workplace," <u>Reed v. LePage Bakeries, Inc.</u>, 244 F.3d 254, 262 (1st Cir. 2001).

Barron also alleges that Defendants somehow "manipulated" the investigation into the April 7 incident, though he does not clearly explicate what he means by that assertion. It appears he believes it was improper for Dekock to be involved in the matter, as he had complained about her (alleged) mistreatment of him in the past. (<u>See</u> Mem. in Opp'n at 41-42.) Yet, he nowhere explains how this evidences discriminatory animus, particularly in light of the fact that Dekock was his supervisor with the ultimate authority to discipline him.[12] Nor does he identify any company policy that Dekock's involvement supposedly violated. In any event, "shortcomings in an investigation do not by themselves support an inference of discrimination," <u>Wierman v. Casey's Gen. Stores</u>, 638 F.3d 984, 997 (8th Cir. 2011), and neither does an employer's violation of its own policies, <u>Anderson</u>, 606 F.3d at 522.

Barron also argues that pretext can be inferred from the fact that Dekock treated him poorly and once labeled him a "drunk." (Mem. in Opp'n at 37.) Yet, he ignores that she opted to hire him full-time *despite knowing of his alcohol problems.* This significantly weakens (if not completely erodes) any connection between his alcoholism and his termination. <u>See, e.g.</u>, <u>Lowe v. J.B. Hunt Transp., Inc.</u>, 963 F.2d 173, 174-75 (8th Cir. 1992) (holding in age-discrimination case that "[i]t is simply incredible . . . that company officials who hired [the plaintiff] at age fifty-one had suddenly developed an

---

[12] Although Regan was Barron's "team leader," Regan had no authority to hire, fire, or discipline employees.

aversion to older people less than two years later"); Colenburg v. STARCON Int'l, Inc., 656 F. Supp. 2d 947, 961 (D. Minn. 2009) (Kyle, J.) (applying same-decisionmaker inference where supervisor who terminated plaintiff was also responsible for promoting him), aff'd, 619 F.3d 986 (8th Cir. 2010). Nor can Barron overcome the fact that Dekock treated others with alcohol problems (including White and Regan) *more* favorably than him and treated other *non-alcoholics* (such as Babcock) in the same manner as him, belying any connection between his condition and Dekock's decision to fire him. The record may well suggest that Dekock disliked Barron, but it contains minimal evidence it was *because of his alcoholism.*

Barron also argues that Defendants have provided shifting reasons for his termination. (Mem. in Opp'n at 43-44.) Shifting reasons can be evidence of pretext, e.g., Bone v. G4S Youth Servs., LLC, 686 F.3d 948, 957 (8th Cir. 2012), but Barron has not created a genuine issue on shifting reasons here. The changed explanation he points to is Dekock's deposition testimony that his "history of calling in sick formed part of the basis for his discharge." (Mem. in Opp'n at 44.) But this is fully consistent with the record. Dekock testified that she discussed *all* of Barron's employment issues with McCready before deciding to terminate his employment, which would presumably include attendance issues, prior warnings, and overall performance. There is no "substantial discrepancy" between Dekock's testimony and Defendants' proffered reason for Barron's termination. Twiggs v. Selig, 679 F.3d 990, 994 (8th Cir. 2012).[13]

---

[13] The same is true regarding a letter (which is not in the record) that Barron claims he received post-termination, indicating that he had been fired for leaving an improper voicemail.

The foregoing is not meant to suggest that everything in the record tips clearly in Defendants' favor. There are some indications that Defendants did not look into all of Barron's (many) complaints during the course of his employment, in contravention of company policy, and did little in response to his requests for a transfer. But in the Court's view, Barron's focus on these issues ignores the bigger picture and loses sight of the forest for the trees. Not only did Defendants hire Barron with full knowledge of his alcoholism, but they raised his pay every year, including once while he was on corrective action, and they repeatedly accommodated his requests for leave and schedule modifications. Barron was considered a valuable employee for more than six years, until his behavior escalated to the point it could reasonably be perceived as threatening – behavior that Barron largely does not deny.

Given this backdrop, Barron has, at most, created only a weak issue whether his termination was based on his disability, given the significant evidence to the contrary. He was required to do more. Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 148 (2000) (summary judgment for defendant proper where "the plaintiff created only a weak issue of fact as to whether the employer's reason was untrue and there was abundant and uncontroverted independent evidence that no discrimination had occurred"); Cha v. Henderson, 258 F.3d 802, 805 n.3 (8th Cir. 2001) ("The Supreme Court [has] recognized that there will be cases in which a plaintiff establishes a prima facie case and produces some evidence of pretext, but nevertheless fails to make a submissible case of discrimination."). His disability-discrimination claim fails.

**B.      Hostile environment**

Barron next contends that Defendants subjected him to a hostile work environment on account of his disability.  Such a claim requires him to show, among other things, that he was "subject to unwelcome harassment that . . . resulted from [a disability] and that . . . was severe enough to affect the terms, conditions, or privileges of his employment." Shaver v. Indep. Stave Co., 350 F.3d 716, 720 (8th Cir. 2003).  This is a demanding standard, Arraleh v. Cnty. of Ramsey, 461 F.3d 967, 979 (8th Cir. 2006), for the discrimination laws "are not a general civility code," Wallin v. Minn. Dep't of Corr., 153 F.3d 681, 688 (8th Cir. 1998).  "Conduct that is merely rude, abrasive, unkind, or insensitive does not come within the scope of the [ADA]." Shaver, 350 F.3d at 721. Rather, to be actionable, the challenged conduct "must . . . be *extreme*," and "discriminatory intimidation, ridicule, and insult [must] permeate[] the workplace." Wilkie v. Dep't of Health & Human Servs., 638 F.3d 944, 953 (8th Cir. 2011) (emphasis added) (citation omitted).

To determine whether conduct crosses the line separating the merely unpleasant from illegal harassment, courts consider the "totality of the circumstances," including the frequency of the conduct, its "severity," whether it is "physically threatening or humiliating, or a mere offensive utterance," and whether it reasonably interferes with the employee's performance.  Harris v. Forklift Sys., Inc., 510 U.S. 17, 23 (1993).  Here, Barron claims a hostile work environment because Dekock was "always 'on him,'" singling him out for criticism, and did not take his complaints about Regan seriously. (Mem. in Opp'n at 44-45.)

But while Dekock's criticisms may have been frequent, they were not physically threatening. Nor was her conduct severe; Barron does not allege that she raised her voice, referred to his prior alcohol use, or used expletives, save for one instance early in his tenure when she allegedly told him that she "was married to a drunk, so don't try and pull your shit here." See Singletary v. Mo. Dep't of Corr., 423 F.3d 886, 893 (8th Cir. 2005) ("We have held that racial slurs alone do not render a work environment hostile as a matter of law."). There is also no evidence that the alleged harassment affected Barron's performance – he was consistently able to do "everything that was required of him despite [Dekock's] conduct," Ryan v. Capital Contractors, Inc., 679 F.3d 772, 779 (8th Cir. 2012), and he continued in the job for six years notwithstanding the so-called hostility. Simply put, the record does not reveal the type of conduct recognized in this Circuit as sufficiently severe or pervasive to establish a hostile work environment. See, e.g., Helton v. Southland Racing Corp., 600 F.3d 954, 959-60 (8th Cir. 2010) (*per curiam*) (rude and demeaning conduct by supervisor insufficient); O'Brien v. Dep't of Agric., 532 F.3d 805, 810 (8th Cir. 2008) (increased scrutiny insufficient); Arraleh, 461 F.3d at 979 (no hostile work environment where Muslim plaintiff claimed he was "subjected to intense negative scrutiny and derogatory comments from his coworkers about his race, appearance, and national origin" from the beginning of his employment, including repeated negative comments about "you people," the suggestion that all Muslims should be killed, a comment that giving the plaintiff a job was "like raising little terrorist kids," and calling the plaintiff "Mr. Cocoa"); Canady v. Wal–Mart Stores, Inc., 440 F.3d 1031, 1034-36 (8th Cir. 2006) (repeated references by supervisor to plaintiff as

"nigga" and "lawn jockey," and suggestions that his "skin color seemed to wipe off onto towels," insufficient).[14]

## C.    Reasonable accommodation

Barron next alleges that Defendants failed to reasonably accommodate his disability by transferring him to another position, free from Regan's alcohol smell. An employer is required to reasonably accommodate an employee's disability, 42 U.S.C. § 12112(b)(5)(A), which may include "reassignment to a vacant position" in appropriate circumstances, § 12111(9). But to obtain such an accommodation, the employee must show that "because of disability, [he] can no[t] perform the essential functions of the job that . . . he has held." Cravens v. Blue Cross & Blue Shield of Kan. City, 214 F.3d 1011, 1017 (8th Cir. 2000) (quoting H.R. Rep. No. 101-485(II), at 63 (1990), reprinted at 1990 U.S.C.C.A.N. 303, 345); accord, e.g., Aka v. Wash. Hosp. Ctr., 156 F.3d 1284, 1301 (D.C. Cir. 1998) ("Congress saw reassignment, as the EEOC does, as an option to be considered only after other efforts at accommodation have failed."); Gile v. United Airlines, Inc., 95 F.3d 492, 498 (7th Cir. 1996) ("Our review of the ADA, its regulations, and the EEOC's interpretive guidance leads us to the conclusion of the majority of courts that have addressed the issue that the ADA may require an employer to reassign a

---

[14] Barron also claims that Defendants created a hostile environment by allowing him to be "subjected daily to Regan's foul pervasive alcohol smell." (Mem. in Opp'n at 46.) But to be actionable, Barron must show that he was "singled out because of [his] disability." Lenzen v. Workers Comp. Reinsurance Ass'n, 705 F.3d 816, 822 (8th Cir. 2013). It is difficult to conceive how Defendants could have singled out Barron *based on his alcoholism* by allowing a co-worker to get away with excess consumption of alcohol.

disabled employee to a different position as reasonable accommodation where the employee can no longer perform the essential functions of their current position.").

Therein lies the rub. There is simply no evidence that Barron could not perform the essential functions of his position in the mailroom without a transfer. The evidence amply establishes that he performed his machine operator duties without problem – consistently receiving positive feedback about his performance (as opposed to his interactions with others) – despite Regan allegedly reeking of alcohol "every day." Simply put, no accommodation was necessary.

### D. Retaliation

Barron next alleges that Defendants terminated his employment in retaliation for his complaints about Regan and Dekock on February 18, 2011, and April 7, 2011.[15] This claim is evaluated under the <u>McDonnell Douglas</u> standard. <u>See, e.g.</u>, <u>Stewart v. Indep. Sch. Dist. No. 196</u>, 481 F.3d 1034, 1042-43 (8th Cir. 2007). As above, the Court will proceed directly to the question of pretext, as Defendants have articulated a legitimate, non-retaliatory reason for the termination of Barron's employment: the April 7 incident with Peifer. And this leads the Court to the same conclusion as before, because Barron

---

[15] As an aside, the Court notes that it is somewhat inconsistent for Barron to claim, on one hand, that he was terminated on account of his *disability*, while on the other hand he claims that he was terminated on account of his *complaints*. <u>See, e.g.</u>, <u>Burlington N. & Santa Fe Ry. Co. v. White</u>, 548 U.S. 53, 63 (2006) (noting that Title VII's antidiscrimination provision "seeks to prevent injury to individuals based on who they are, *i.e.*, their status[,] [while] [t]he antiretaliation provision seeks to prevent harm to individuals based on what they do, *i.e.*, their conduct"); <u>CBOCS W., Inc. v. Humphries</u>, 553 U.S. 442, 460 (2008) (Thomas, J., dissenting) ("Retaliation is not discrimination based on [disability]. When an individual is subjected to reprisal because he has complained about [disability] discrimination, the injury he suffers is not on account of his [disability]; rather, it is the result of his conduct.").

points to the same evidence of pretext (see Mem. in Opp'n at 51) already addressed, which the Court has found wanting.

The only *new* argument Barron offers to show Defendants engaged in retaliation focuses on the temporal proximity between his complaints and his termination. He notes that he was fired only two weeks after his April 7 meeting with Peifer, and approximately two months after his February 18 complaints. (Mem. in Opp'n at 49-51.)

But while an employer's conduct close in time to an employee's complaint may be sufficient to establish a *prima facie* case of retaliation, "[g]enerally, more than a temporal connection . . . is required to present a genuine factual issue of retaliation." Kipp v. Mo. Highway & Transp. Comm'n, 280 F.3d 893, 897 (8th Cir. 2002); accord, e.g., Thomas v. Corwin, 483 F.3d 516, 530 (8th Cir. 2007); Logan v. Liberty Healthcare Corp., 416 F.3d 877, 881 (8th Cir. 2005). The significance of the timing here is especially limited, given that Barron admittedly complained several times over the years about his (alleged) mistreatment without any adverse consequences. Moreover, the incident with Peifer took place *after* Barron's complaints, and such an intervening event "gives an explanation for the temporal proximity other than a [retaliatory] motive." Wierman, 638 F.3d at 998; accord, e.g., Cheshewalla v. Rand & Son Constr. Co., 415 F.3d 847, 852 (8th Cir. 2005). Barron had a long and documented history of problems interacting and communicating with his co-workers, and it was exactly this type of behavior, according to Defendants, that resulted in his termination. "Evidence that the employer had been concerned about a problem before the employee engaged in the protected activity undercuts the significance of the temporal proximity." Smith v. Allen Health Sys., Inc., 302 F.3d 827, 834 (8th Cir.

2002); accord, e.g., Hervey v. Cnty. of Koochiching, 527 F.3d 711, 723 (8th Cir. 2008).

Barron has not created a jury issue on his disability retaliation claim.

## II.      The Equal Pay Act claims

In Count III of his Complaint, Barron alleges that he was paid less than similarly situated females for the same work, and in Count IV he alleges that Defendants retaliated against him for complaining about the pay disparity, each in violation of the Equal Pay Act, 29 U.S.C. § 206(d).  These claims are discussed in turn below.

### A.      Unequal pay

The Equal Pay Act provides, in pertinent part:

> No employer . . . shall discriminate . . . between employees on the basis of sex by paying wages to employees . . . at a rate less than the rate at which [it] pays wages to employees of the opposite sex . . . for equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions, except where such payment is made pursuant to (i) a seniority system; (ii) a merit system; (iii) a system which measures earnings by quantity or quality of production; or (iv) a differential based on any other factor other than sex.

29 U.S.C. § 206(d)(1).  Under the statute, "a plaintiff must establish a prima facie case by show[ing] that the defendant paid [fe]male workers more than []he was paid for equal work in jobs that required equal skill, effort, and responsibility and work performed under similar conditions."  Taylor v. White, 321 F.3d 710, 715 (8th Cir. 2003).  "Equal pay for equal work is what the [statute] requires, and those elements are the focus of the prima facie case."  Price v. N. States Power Co., 664 F.3d 1186, 1192-93 (8th Cir. 2011).

If a plaintiff establishes a *prima facie* case under the Equal Pay Act, the burden shifts to the defendant "to prove one of the [four] affirmative defenses set forth" therein.

Taylor, 321 F.3d at 715.  Notably, this differs from the typical McDonnell Douglas analysis.  The Equal Pay Act "prescribes a form of strict liability:  Once the disparity in pay between substantially similar jobs is demonstrated, the burden shifts to the defendant to prove that a 'factor other than sex' is responsible for the differential.  If the defendant fails, the plaintiff wins.  *The plaintiff is not required to prove discriminatory intent on the part of the defendant*."  Miranda v. B & B Cash Grocery Store, Inc., 975 F.2d 1518, 1533 (11th Cir. 1992) (emphasis added); accord, e.g., Strecker v. Grand Forks Cnty. Soc. Serv. Bd., 640 F.2d 96, 99 n.1 (8th Cir. 1980), overruled on other grounds by Pullman-Standard v. Swint, 456 U.S. 273 (1982).  In other words, an Equal Pay Act defendant cannot avoid liability merely by *proffering* a legitimate non-discriminatory reason for a difference in pay.  Taylor, 321 F.3d at 716.  Rather, "the defendant must *prove* that the . . . differential was based on a factor other than sex."  Id. (emphasis added).

Here, Defendants argue that Barron cannot establish even a *prima facie* case of pay discrimination, but the Court does not agree.  There is no dispute Barron and Babcock were the only two employees working in the kernroom during Barron's tenure, except for a short period of time when Babcock was on medical leave and was replaced by Mona Kurtti, a temporary employee.  There is also no dispute that the two mailing machines in the kernroom operated in the same fashion and required the same level of skill, effort, and responsibility.  Yet, Barron's hourly rate was lower than Babcock's every single year he was employed by Defendants.  In fact, Barron's hourly rate was *less than Kurtti's* during her short stint filling in for Babcock.  On these facts, the Court

determines that Barron has established a *prima facie* case – he received unequal pay for equal work.

Defendants argue that men and women have been hired in the kernroom at equal rates of pay ($14 per hour) since 2011. (Def. Mem. at 35.) But this does not undermine Barron's *prima facie* case, because all of those employees were hired *after his employment terminated*.[16] To be sure, the Eighth Circuit has not precluded courts from considering employees hired after a plaintiff's tenure when undertaking Equal Pay Act comparisons. See, e.g., Broadus v. O.K. Indus., Inc., 226 F.3d 937, 941-42 (8th Cir. 2000). But the Court finds it unnecessary to look at successor employees here, as the best comparators worked side-by-side with Barron over the course of his six-year employment: Babcock and Kurtti. And each of those women was paid more than Barron for the same work under the same conditions.

With a *prima facie* case established, the burden shifts to Defendants to prove one of the Equal Pay Act's four affirmative defenses in order to avoid liability. Defendants rely upon the fourth defense, namely, that the pay differential was based on a factor "other than sex." As noted above, Defendants bear the burden of proof on this issue, and they have not shown they are entitled to judgment as a matter of law based upon it.

Defendants argue that Babcock was paid more than Barron because she (1) "did not have conduct problems like Barron," (2) "received higher review scores," and (3) "worked for Defendants for nine years longer than Barron." (Def. Mem. at 36.)

---

[16] Indeed, it may be the case that Defendants opted to pay men and women the same hourly rate after 2011 *because of* Barron's complaints about disparate pay. The significance of these later-hired employees, therefore, is somewhat suspect.

There are several problems with these arguments. First, Defendants overlook that Babcock is not Barron's only relevant comparator. Kurtti also performed the same job, and she was a temporary employee with no experience working on the mailing machines in question. Yet, even she was paid a higher hourly rate than Barron. This significantly undermines Defendants' contention that the pay disparity was due to length of employment or experience working in the position. Second, while Defendants point to Babcock's better reviews and absence of conduct issues, the documents describing the "Market Reference Point," which Defendants used to determine the appropriate pay rate, indicate that the focus was on individual job duties; they make no mention of performance problems or conduct. And Peifer acknowledged that Barron was paid *below* the Market Reference Point for most of his tenure, while Babcock was not. Third, Regan – who supervised Barron, Babcock, and Kurtti, and who knew the factors considered important to Defendants in setting pay rates – testified in his deposition that it would be "unfair" for Barron to receive several dollars per hour less in pay than Babcock or Kurtti.

On these facts, the Court cannot conclude that Defendants are entitled to prevail on their statutory defense as a matter of law. A genuine issue exists whether the pay disparity was based on a factor "other than sex."

### B.     Retaliation

Barron next contends that Defendants terminated his employment on account of his pay complaints. The Court evaluates this claim under the McDonnell Douglas standard. See, e.g., Grey v. City of Oak Grove, Mo., 396 F.3d 1031, 1034-35 (8th Cir.

2005).  Assuming *arguendo* that he has stated a *prima facie* case,[17] this claim fails for the reasons articulated above:  Barron points to the same evidence of pretext already discussed, which the Court has found insufficient to create a genuine issue for trial.

## III.    Minnesota Whistleblower Act

In his final claim, Barron alleges that Defendants violated the Minnesota Whistleblower Act, which prohibits an employer from discharging or otherwise discriminating against an employee who "reports a violation or suspected violation of any federal or state law . . . to an employer."  Minn. Stat. § 181.932, subd. 1(1).  This claim also must be evaluated under the McDonnell Douglas standard, see, e.g., Chial v. Sprint/United Mgmt. Co., 569 F.3d 850, 854 (8th Cir. 2009), and at the third step of the analysis Barron points to the same evidence of pretext already discussed.  Accordingly, this claim also fails.[18]

---

[17] The Court questions whether Barron can establish a *prima facie* case, which requires him to have "participated in statutorily protected activity."  Grey, 396 F.3d at 1034.  In other words, he must have provided Defendants with "fair notice that [he was] making a complaint that could subject [them] to a later claim of retaliation."  Kasten v. Saint-Gobtain Performance Plastics Corp., __ U.S. __, 131 S. Ct. 1325, 1334 (2011); accord, e.g., Montgomery v. Havner, 700 F.3d 1146, 1149 (8th Cir. 2012) ("To fall within the scope of the antiretaliation provision, a complaint must be sufficiently clear and detailed for a reasonable employer to understand it, in light of both content and context, as an assertion of rights protected by the statute and a call for their protection.").  While it is clear Barron complained about his rate of pay, there is no evidence he indicated he was unfairly compensated *because of his sex*.  Indeed, he repeatedly noted in his deposition that he *outproduced* Babcock and told Defendants he thought he should be paid more *for that reason*.

[18] Defendants argue that this claim also fails because Barron's "reports" of illegality concerned him alone, rather than some broader wrongdoing on the part of Defendants.  (Def. Mem. at 38-39.)  While it is true some courts have recognized, in order to state a claim under the Whistleblower Act, that "a report must be made for the protection of the public or some other person, not just the employee's own rights," Harnan v. Univ. of St. Thomas, 776 F. Supp. 2d 938, 948 (D. Minn. 2011) (Montgomery, J.), the Minnesota Supreme Court has given mixed

## CONCLUSION

Based on the foregoing, and all the files, records, and proceedings herein, **IT IS ORDERED** that Defendants' Motion for Summary Judgment (Doc. No. 43) is **GRANTED IN PART** and **DENIED IN PART**.  The Motion is **GRANTED** with respect to Barron's disability discrimination, retaliation, hostile-environment, and failure-to-accommodate claims (Counts I and II); his Equal Pay Act retaliation claim (Count IV); and his Whistleblower Act claim (Count V), and those claims are **DISMISSED WITH PREJUDICE**.  The Motion is **DENIED** with respect to Barron's Equal Pay Act discrimination claim (Count III).

Date:  August 2, 2013

s/Richard H. Kyle
RICHARD H. KYLE
United States District Judge

---

signals.  <u>Compare</u> <u>Williams v. St. Paul Ramsey Med. Ctr., Inc.</u>, 551 N.W.2d 483, 484 n.1 (Minn. 1986) (suggesting the statute reaches "whistleblowing" not by an employee "personally and uniquely affronted by the employer's unlawful conduct but rather . . . for the protection of the general public or, at the least, some third person or persons in addition to the whistleblower"), <u>with</u> <u>Anderson-Johanningmeier v. Mid-Minn. Women's Ctr., Inc.</u>, 637 N.W.2d 270, 274-77 (Minn. 2002) (statute, by its terms, applies to a "violation of *any* federal or state law," even if that violation impacts the plaintiff alone) (emphasis added).  Ultimately, the Court need not wade into this legal thicket, as the Whistleblower Act claim fails regardless.